**In the Matter of SWAN-FINCH OIL CORPORATION, Keta Gas and Oil Company, Swan-Finch Petro Chemical Corporation, Debtors.**

United States District Court
S. D. New York.

Nov. 7, 1962.

George C. Levin and James V. Hallisey, New York City, for trustees.

Arthur D. Emil, New York City, for Peter Jakobson.

Finley, Hoffpauir, Nolan & Waldman, New York City, for Herbert Birrell, appearing specially; Aaron Waldman and Robert Nolan, New York City, of counsel.

PALMIERI, District Judge.

The Trustees, engaged in the reorganization of various corporate debtors pursuant to Chapter X of the National Bankruptcy Act, have moved for the appointment of a Receiver to manage and con-

trol certain property in New York City pending the determination of its ownership and of their right to recover damages. The property in question consists of a 14 story and penthouse apartment building located at 1050 Park Avenue in New York City.

The evidence submitted upon this motion by the Trustees justifies strong suspicion that this property has been partly owned if not controlled by Lowell Birrell, a fugitive from justice, presently reported to be residing in Rio de Janeiro, Brazil. The title to this property has been held by Herbert A. Birrell, a citizen of the United States, a lawyer, and a brother of Lowell Birrell. Herbert acquired title as a result of a corporate transfer planned and executed by Lowell in an apparently successful attempt to frustrate and defeat parties with financial claims against him. Herbert Birrell has for many years been associated with the business activities and enterprises of his brother Lowell and it is not improbable that his record ownership of this property has been a device for the protection and comfort of Lowell Birrell. Indeed, since the flight of Lowell Birrell to Brazil in 1959, to avoid prosecution for many crimes for which he stands indicted,[1] Herbert Birrell has been making periodic payments to Lowell Birrell's wife, Merrie. These payments were made through one Hugh H. Begley, who has had a long association with Lowell Birrell and his enterprises. The monies paid to Mrs. Birrell have not, in her opinion, been sufficiently large and toward the end of 1961, she had a disagreement with Herbert Birrell which led her to make threats to the effect that if she did not receive more money, she would tell everything that she knew. Indeed, she has asserted rights of ownership in this property.

This disagreement between Herbert A. Birrell and Mrs. Lowell Birrell apparently precipitated a number of strange financial transactions with respect to this building. In December 1961 Herbert Birrell successfully applied for an increased first mortgage on the property in question in the sum of $1,100,000. The existing first mortgage on the property was in the sum of $442,734.94. An equivalent amount from the new first mortgage money was paid to the prior mortgagee to liquidate it. The balance of over $650,000 has disappeared and is beyond the control of this Court except for the sum of $50,000 which appears to have been reserved for alteration of the premises. The very substantial sums making up the balance of this first mortgage money were deposited in banks situated here and in various outlying jurisdictions, and in almost every instance each bank account was closed out a short time after the money was deposited. There was no apparent business reason for mortgaging this property so heavily or for disposing of the funds in the manner indicated.

Contemporaneously with the conclusion of the mortgage transaction just described, Mr. Herbert Birrell moved from his penthouse apartment situated in the premises in question and departed for Canada. The Trustees attempted in vain to communicate with him over a period of several months and were never advised that his departure was final and irreversible. They were led to believe that he had departed for an extended hunting trip and it was only upon the argument that his attorneys appeared specially and took the position that Herbert Birrell had become a bona fide resident of Canada without any apparent intention of returning to this country. It was also stated by them that Herbert Birrell was contemplating a safari in Africa.

---

1. Lowell Birrell was indicted in what was then the New York State Court of General Sessions, New York County, charged with 69 counts of larceny in the first degree for the fraudulent manipulations and theft of securities and property of Swan-Finch. He has been similarly indicted for various serious charges involving fraudulent manipulation of assets and securities in the United States District Court, Southern District of New York, and in the Superior Court of the State of California, Los Angeles County.

Upon departure from New York, Herbert Birrell transferred the management of the property to one Peter Jakobson, a tenant of the property, who is also in the real estate business. Although the form of written contract between Herbert Birrell and Peter Jakobson is that of a net lease, it is subject to cancellation upon 60 days' notice at the end of any month and upon the payment of $5,000 pursuant to a specified form of accounting. To all intents and purposes, Jakobson is the agent of Herbert Birrell.

There is little doubt, in view of the facts detailed above, that the appointment of a Receiver would be appropriate if the Court possesses the power to grant this remedy. It has been asserted, however, primarily on the basis of Section 2, sub. a(3) of the Bankruptcy Act,[2] that such power is lacking. Section 2, sub. a(3) expressly authorizes appointment of a receiver to take charge of the bankrupt's property until the petition is dismissed or the trustee has qualified. It is claimed that the section by necessary implication precludes appointment of a receiver in a situation such as this in which the trustee has already qualified. This argument is made in spite of Section 2, sub. a(15),[3] which provides that the bankruptcy court may "Make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this title:" and in spite of Section 2, sub. b,[4] which provides that "Nothing in this section contained shall be construed to deprive a court of bankruptcy of any power it would possess were certain specific powers not herein enumerated."

To give Section 2, sub. a(3) such a restrictive effect represents an overly broad reading of that section, and an overly narrow interpretation of the powers accorded a district court by the Bankruptcy Act. The purpose of Section 2, sub. a(3) is to provide a means of conserving the bankrupt's property between the filing of the petition and either its subsequent dismissal or the appointment of a trustee.[5] Accordingly, the receiver is empowered to take charge of the property; to protect the interests of creditors; to prosecute or defend any pending suit; and to commence or prosecute suits of its own. The limitation that arises from the language "until * * * the trustee is qualified" is directed primarily to the situation in which the trustee has already been appointed and yet the receiver continues to assert its right to administer the estate. It would be unseemly if the receiver and the trustee, both allegedly acting in the interests of creditors and as officers of the court, were permitted to dispute with each other over administration of the bankrupt's estate. Exactly such a dispute was in prospect in the Empire Finance case [6] cited by counsel for Herbert Birrell, and was undoubtedly the reason for the holding that the bankruptcy court had no general equity power to appoint a receiver who would oppose certain facets of the trustee's administration.

In this case, however, it is the Trustees themselves who are asking for the Receiver. Thus, no danger of conflict is present. Furthermore, this application is not made in the context of overall administration of the bankrupt's affairs, as contemplated by Section 2, sub. a(3), but is solely to preserve a single piece of property now in the hands of a third party.

If more specific authority for this Court's power were needed, reference could be had to Steelman v. All Continent Corp., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085 (1937) and In re Mitchell, 278 F. 707 (2d Cir., 1922). The precise holding in Steelman was that a bankruptcy court possessed the power to en-

---

2. 11 U.S.C. § 11, sub. a(3).

3. 11 U.S.C. § 11, sub. a(15).

4. 11 U.S.C. § 11, sub. b.

5. See 1 Collier on Bankruptcy § 2.24, at 209 (14th Ed. 1961).

6. In re Empire Finance Corp., 1 F.Supp. 298 (N.D.Cal.1932).

join a proceeding brought by a third party in another district court, when that proceeding would interfere with, indeed, severely frustrate, the bankruptcy action. In the course of the opinion, Justice Cardozo specifically suggested that a receiver could be appointed to manage and preserve the property involved pending the outcome of a plenary suit between the trustee and the other claimants.[7] Although it is not clear from the opinion whether Justice Cardozo was referring to appointment of a receiver by the bankruptcy court, or by the court hearing the plenary suit, his reference is undoubtedly equally applicable to both.[8]

In the Mitchell case, the Court of Appeals had before it the question of the validity of an order requiring a third party to deposit a contested fund into court or to give equivalent security. This order had been obtained by a receiver of the estate appointed prior to the qualification of a trustee. In affirming the order, the Court pointed out that had the receiver possessed the same standing as a trustee to litigate claims, that an equitable remedy to preserve the property held by the third party, including that of a receivership, would have been proper.[9] The fact that the receiver was believed by the district court not to possess such standing did not detract from the power to preserve the property until a trustee could be appointed and suit prosecuted to its termination. These decisions leave no doubt that this Court possesses power to appoint a Receiver for 1050 Park Avenue.

Totally apart from the Court's power in this matter, I have serious reservations concerning Peter Jakobson's standing to object to this application. His contract is still in force. There is no need, therefore, to consider his objections to the appointment of the Receiver since for the time being, at least, the Receiver will step into the shoes of Herbert Birrell and one of his first obligations will be to appraise the business value of the Jakobson contract and take such action with respect to it as he may be advised.

An order appointing the Receiver is filed herewith.

---

7. 301 U.S. 278, at 287, 57 S.Ct. 705, at 709, 81 L.Ed. 1085.

8. See also Halpert v. Engine Air Service, Inc., 212 F.2d 860, 862–863 (2d Cir., 1954).

